AUG 1 4 2012

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

|  |  |  |
|---|---|---|
| Meloni Thomas, | ) | |
|     Petitioner, | ) | |
| | ) | |
| v. | ) | 1:11cv1074 (GBL/IDD) |
| | ) | |
| Wendy S. Hobbs, | ) | |
|     Respondent. | ) | |

### MEMORANDUM OPINION

This Matter is before the Court on respondent's Motion to Dismiss this petition for a writ

of habeas corpus pursuant to 28 U.S.C. § 2254, filed through counsel by Meloni Thomas, a

Virginia inmate. Petitioner challenges the constitutionality of her conviction of first degree

murder and use of a firearm entered on a jury verdict in the Circuit Court of Brunswick County,

Virginia on the ground that the Virginia Model Jury Instruction permitting the inference that a

person intends the natural consequences of his acts is unconstitutional. Respondent has moved to

dismiss the petition, and has filed a supporting memorandum with exhibits. Petitioner

subsequently filed a Memorandum in Opposition to Respondent's Motion to Dismiss. After

careful consideration, respondent's Motion to Dismiss will be granted, and the petition will be

dismissed with prejudice.

### I. Background

On December 20, 2007, Thomas was sentenced to serve a total of 38 years in prison, with

35 years suspended, following her conviction of first degree murder and use of a firearm. Case

Nos. CR05000204-00 and -03. The victim was petitioner's father, William David Thomas.

1

Petitioner appealed her conviction to the Court of Appeals of Virginia, which denied her appeal in a *per curiam* order. Thomas v. Commonwealth, R. No. 0202-08-2 (Va. Ct. App. Dec. 16, 2008). That decision subsequently was affirmed by an order of a three-judge panel. Thomas v. Commonwealth, R. No. 0202-08-2 (Va. Ct. App. Feb 17, 2009). Petitioner then appealed to the Supreme Court of Virginia and raised fifteen assignments of error, including the argument she presses here. The Supreme Court of Virginia rejected her arguments and affirmed her conviction on January 15, 2010. Thomas v. Commonwealth, 279 Va. 131, 688 S.E.2d 220 (Jan. 15, 2010). The United States Supreme Court thereafter denied Thomas' petition for a writ of certiorari to the Supreme Court of Virginia. Thomas v. Virginia, __ U.S. __, 131 S.Ct. 143 (Oct. 4, 2010). There was no state corpus proceeding.

The facts that gave rise to Thomas' conviction were described in detail in the opinion of the Supreme Court of Virginia. Briefly, an officer of Brunswick County Sheriff's Office testified that he went to the decedent's house in response to a missing persons report, and found a "horribly decomposed" body in a shed on the property. Thomas v. Commonwealth, 688 S.E.2d at 226. The body was identified as that of petitioner's father through dental records, and an autopsy determined that the cause of death was blunt force injury to the head, which was "extensive[ly] damaged." Id. at 226 - 27. Although the victim also had numerous shotgun pellet wounds, they were deemed "potentially survivable." Id. at 227. Blood stains were found throughout the victim's house, and appeared to be heaviest in his bedroom, where efforts to clean up the stains were apparent. Id. at 226. Thomas and her boyfriend, Cardell Avent, were developed as suspects, and they were located, along with petitioner's children, in Arizona. Id. at 227. Major Roberts and Captain Washburn of the Brunswick County Sheriff's Officer flew to

2

Arizona, and petitioner was interviewed by Major Roberts on September 3 and 4, 2005,

ultimately providing a series of statements, including several written statements and two audio-

recorded interviews. As the Supreme Court of Virginia described:

> In Thomas' statements to Major Roberts, she admitted that on August 9, 2005, she went to her father's residence with Avent to obtain several of her 'welfare checks' that were at her father's house. Thomas stated that she and Avent entered William's residence together through the backdoor of the residence. Thomas acknowledged that she and Avent did not have permission to be in William's home and that her father did not 'let [her] or [Avent] into his house on August 9, 2005.'

> In one of Thomas' written statements, she acknowledged that after she entered her father's home, she

>> asked [her] dad for [her] checks he refused. [Avent] then pulled o[ut] a gun and made [her] dad go upstairs to get them. [Her] dad gave [her] the checks and him and [Avent] started arguing. [She] was at the top of the stairs and [Avent] shot him once. [She] got scared. [Avent] was yelling at [her] telling [her] he would kill [her] too. [Avent] was hitting [her] dad in the face with the gun. [Avent] told her to check on the kids in the car and when [she] came back into the house [her] dad's body was gone. [Avent] had moved his body. [Avent] told [her] to get [] cleaning supplies out of the kitchen. [She] gave them to [Avent] and he cleaned up most of the blood. [Avent] was running and throwing things in the well. [Avent] made her get a blue and white blanket and put it in the well. After that [she and Avent] left.

> Thomas supplemented her written statement with written answers to numerous written questions Major Roberts asked her. In those written answers, Thomas further stated that

>> [she] did not see the gun until [her] father met [her and Avent] at the steps and [she] asked for [her] checks and [Williams] said 'NO' and then [Avent] pushed [her] aside and pulled out the gun and told

3

[her] daddy to go get the checks, then [she and Avent] followed daddy up the steps to his bedroom and he got the checks from a desk or dresser behind his bed and he gave the checks to [Avent] and [Avent] gave them to [her] and [she] backed up to the top of the steps and [Avent] and daddy got to arguing ... Avent shot [her] daddy one time and her daddy fell beside the bed and [Avent] was on top of him hitting [her] dad in the head and [Avent] hit him about 10 times at the most and it last [sic] for a couple of minutes then [Avent] told her to go check on the kids. When [she] went back into the house [her] dad's body was gone and [Avent] told [her] to get the cleaning supplies, then [she and Avent] started cleaning up, but [she] couldn't do much, because [she] got sick. [Avent] was running in and out of the house getting stuff and putting it in the well. Then [she and Avent] left.

Throughout her statements, Thomas also maintained that she did not 'see' that Avent had a gun until Avent had drawn the gun on William after William refused to give Thomas her checks. Thomas also described Avent's gun to Major Roberts as 'a sawed off shotgun' that was 'a single barrel,' even though she only saw the 'one time' and also added that the gun 'had duc[t] tape' on it which his why she 'knew it was a single barrel.'

Thomas was asked if she 'put [her] father in a shed after he was killed and shut the shed door,' and Thomas responded, '[n]o, only [Avent] could have done it.' Thomas also told Major Roberts that she drove the car from her father's residence and that she, Avent, and her children drove to a grocery store in North Carolina to cash the checks she obtained from her father. Before Thomas went into the grocery store, she changed clothes, then had 'a woman named Jean' cash 'one check.' Thomas told Major Roberts that she then met John Bass in Roanoke Rapids, North Carolina 'and gave him the other checks to be cashed.' Thomas stated that she, Avent, and her children then drove to Arizona. When asked in a written question why she did not call the police, Thomas wrote that Avent 'told [her] he would kill [her] if [she] told anybody.'

While Thomas told the police Avent threatened her, she testified at

trial that she did not go to the police or seek help because Avent threatened her and her children, and several of the Commonwealth's witnesses offered testimony demonstrating that Thomas had numerous opportunities to call the police or get help if she had so desired. Jean Chaney, who works in customer service at a grocery store, cashed one of Thomas' checks on the day in question, and she testified that Thomas came into the grocery store alone. Sharon Parish, who lived in Arizona and with whom Thomas, Avent, and Thomas' children lived in Arizona, testified that the police station was about a quarter of a mile from their house, that Avent left Thomas and her children for two days while he went to work, and that Thomas and her children went with Sharon Parish at least once to a Wal-Mart without Avent. Finally, John Bass, who used to date Thomas, testified that he met Thomas on the day in question at a fast food restaurant, then took Thomas to a bank to get a check cashed, which took about 10 to 15 minutes. John Bass also stated that Thomas never asked him to call the police for her.

The Commonwealth also presented several witnesses, each of whom was either family or friends of Thomas, who testified that prior to the day in question, Thomas told them she wished her father was dead, that she hated him, that she would kill her father by poisoning him with rat poison or by shooting him, that 'either she could do it, or she could get someone else to do it,' and that she discussed several unsolved murders that occurred in Brunswick County. Page Barham, Thomas' cousin, testified that Thomas told her that on a prior occasion she broke into her father's residence 'and she shot at him, and it hit the pillow.' John Bass testified that on August 9, 2005, the day of the murder, Thomas told him she had a 'scuffle' with her father and that 'she was running with a warrant on her.' Thomas' attorney did not object to this testimony.

\* \* \*

Thomas testified on her own behalf. She addressed the comments she had made about wishing her father were dead and that she hated him by stating that she and her father had problems but that she did not 'know one daughter that doesn't get mad at her dad or mom or guardian at one point of her life or another.' As to the day in question, Thomas testified she went with Avent and her three children to 'get some child support checks that [William] had.' Before arriving at her father's house, Thomas testified that she stopped by Avent's mother's house and Avent 'put a duffle bag in [her] truck' but she did not see

5

what was in the 'duffle bag.' Thomas maintained during her testimony that she did not 'see' a gun in Avent's possession.

Thomas admitted to entering her father's home and that an argument ensued between her and her father. She testified at trial that Avent then 'came up behind [her] and kind of pushed [her] out of the way' and 'pull[ed] a gun ... [f]rom his pants.' According to Thomas, Avent 'told [her] dad to get the 'F' up the stairs' to get Thomas' checks. Thomas and Avent followed William upstairs to his bedroom where William got Thomas' checks. Thomas testified that she then turned to go back down the stairs and she 'heard the shotgun go off' one time and that she then went back 'in the hallway' and Avent was standing over William 'hitting him.' Specifically, Thomas testified that Avent was hitting William in the head with the gun.

Thomas testified that she got 'upset, really hysterical' and that Avent told her 'to shut the 'F'' up, or [she] would be next' and for her to 'go check on the kids.' Thomas then left her father's house, and went to her car to check on her children, and then moved the car 'beside [her] father's truck which was behind the shed.' After staying in the car 'about ten minutes,' Thomas testified that Avent was 'cleaning up' and he told her to get 'two bottles of ammonia or bleach and to go up the steps with them' and then he again threatened Thomas and her children. Thomas then testified that she helped Avent 'clean up,' and that she followed Avent's instructions by throwing a blue and white comforter 'in the well.'

The following colloquy occurred between the Commonwealth's Attorney and Thomas during Thomas' cross-examination:

Q.     Having just seen your father shot and bludgeoned to death, why didn't you just drive out of the driveway with your three kids in the car, go to the police station?

A.     At that time, I wasn't thinking very clearly. I had just witnessed the worst thing I had ever seen in my life. I also had a choice to make.

Q.     What choice did you have to make?

A.     To put my kids' life in danger and my life in danger.

6

> Q.     You thought they would be less in danger there with
>        this man who had just bludgeoned your father and
>        shot him; is that what you thought?
>
> A.     No.  At the time, I wasn't thinking very clearly at all.

While Thomas testified that she 'was under constant threats from'
Avent, during cross-examination the Commonwealth's Attorney
asked her when she was taken into custody in Arizona if,

> > at that point, you said, Oh, thank God, I have finally
> > been saved from this.  Let me tell you what happened.
> > [Avent] has been threatening me for three weeks.  Is
> > that what you said?
>
> A.     No.
>
> Q.     But they were Arizona Officers.  How about when
>        Kent Washburn came, the man who had known you
>        all your life?  How about when he came and asked
>        you; you told him that, right?  You said, Kent, I am so
>        glad to see you.  Let me tell you what happened.  This
>        man has been threatening me.  Thank God you got my
>        kids out of that situation?
>
> ...
>
> A. No.

Thomas, 688 S.E.2d at 228 - 30, footnote omitted.

Petitioner timely filed the instant application for § 2254 relief from her conviction on

September 29, 2011 in the United States District Court for the Western District of Virginia.

Because the conviction was entered in Brunswick County, which is located in the Eastern District

of Virginia, the action was transferred to this court on September 30, 2011.   Respondent was

directed to show cause why the writ should not issue, and on February 1, 2012, respondent filed a

Motion to Dismiss the petition, along with a supporting Memorandum of Law and exhibits.

7

Petitioner submitted a Memorandum in Opposition to Motion to Dismiss on February 15, 2012. Respondent acknowledges correctly that petitioner's claim has been exhausted in the state forum.[1] Accordingly, this matter is now ripe for disposition.

## II. Standard of Review

When a state court has addressed the merits of a claim raised in a federal habeas petition, a federal court may not grant the petition based on the claim unless the state court's adjudication is contrary to, or an unreasonable application of, clearly established federal law, or based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d). Whether a state court decision is "contrary to" or "an unreasonable application of" federal law requires an independent review of each standard. See Williams v. Taylor, 529 U.S. 362, 412-13 (2000). A state court's determination runs afoul of the "contrary to" standard if it "arrives at a conclusion opposite to that reached by [the United States Supreme] Court on a question of law or if the state court decides a case differently than [the United States Supreme] Court has on a set of materially indistinguishable facts." Id. at 413. Under the "unreasonable application" clause, the writ should be granted if the federal court finds that the state court "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. Importantly, this standard of reasonableness is an objective one.

---

[1] Before bringing a federal habeas petition, a state prisoner must first exhaust his claims in the appropriate state court. 28 U.S.C. § 2254(b); Granberry v Greer, 481 U.S. 129 (1987); Rose v. Lundy, 455 U.S. 509 (1982); Preiser v. Rodriguez, 411 U.S. 475 (1973). To comply with the exhaustion requirement, a state prisoner "must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999). Thus, a petitioner convicted in Virginia first must have presented the same factual and legal claims raised in his federal habeas corpus application to the Supreme Court of Virginia on direct appeal or in a state habeas corpus petition. See, e.g., Duncan v. Henry, 513 U.S. 364 (1995).

Id. at 410. Under this standard, "[t]he focus of federal court review is now on the state court decision that previously addressed the claims rather than the petitioner's free-standing claims themselves." McLee v. Angelone, 967 F.Supp. 152, 156 (E.D. Va. 1997), appeal dismissed, 139 F.3d 891 (4th Cir. 1998) (table).

### III. Analysis

During petitioner's trial, the jury was instructed in accordance with the Virginia Model Jury Instructions as follows:

> You may infer that every person intends the natural and probable consequences of his acts.
>
> Tr. 572

On direct appeal, petitioner challenged the foregoing instruction on the ground that it "is the functional equivalent of a directed verdict" and "shifts the burden of proof regarding a defendant's criminal intent." The Court of Appeals of Virginia found her argument to be without merit for the following reason:

> Appellant argues the trial court erred in granting the Commonwealth's proffered instruction regarding the natural and probable consequences of one's acts.
>
> * * *
>
> As noted above, 'the Due Process Clause does not prohibit the use of a permissive inference as a procedural device that shifts to a defendant the burden of producing some evidence contesting a fact that may otherwise be inferred, provided that the prosecution retains the ultimate burden of proof beyond a reasonable doubt.' Dobson [v. Commonwealth, 260 Va. [71] at 74-5, 531 S.E.2d [569] at 571 [(2000)]. Thus, we find no error with the court's instruction.

Thomas v. Comm., R. No. 0202-08-2, slip op. at 8.

Petitioner renewed her challenge to the jury instruction at issue on further review by the Supreme Court of Virginia. However, that tribunal also rejected her argument, on the following

holding:

> We have previously addressed this question in *Schmitt v. Commonwealth*, 262 Va. 127, 145, 547 S.E.2d 186, 198-99 (2001). In *Schmitt*, we approved a jury instruction stating that '[i]t is permissible to infer that every person intends the natural and probable consequences of his or her acts' and that such an inference 'did not establish an improper presumption but merely stated a permissive inference.' *Id.* We further explained that '[u]nlike conclusive or burden shifting presumptions regarding a defendant's criminal intent, which are constitutionally invalid, the present instructions did not require the jurors to draw any inference or alter the Commonwealth's burden of proving [the defendant's] criminal intent beyond a reasonable doubt.' *Id.* at 145, 547 S.E.2d at 199.
>
> Here, the concert of action instruction, Number 16, read: 'You may infer that every person intends the natural and probable consequences of his acts.' This jury instruction is almost identical to the jury instruction given in *Schmitt*. Therefore, the trial court did not err in granting Instruction Number 16 on concert of action and permissible inferences.

Thomas v. Commonwealth, 688 S.E.2d at 166.

Applying the rigorous standard of review now applicable in § 2254 proceedings, the Court finds no basis upon which the Virginia courts' rejection of petitioner's claim appropriately could be abrogated. The decision of the Supreme Court of Virginia that the jury instruction at issue is constitutionally valid is neither contrary to, nor an unreasonable application of, applicable federal law. Cf. Williams, 529 U.S. at 412-13. It is well established that the due process guarantee is violated when the burden of disproving an element of a crime charged is shifted to the defendant. Mullaney v. Wilbur, 421 U.S. 684 (1975). Thus, where a jury instruction shifts the burden of persuasion by means of a mandatory presumption, an ensuing conviction cannot stand. Sandstrom v. Montana, 442 U.S. 510, 514 - 15 (1979). On the other hand, where the jury instruction creates no more than a permissive inference, the Due Process

10

Clause is violated only if the suggested conclusion is unreasonable in light of the proven facts. Francis v. Franklin, 471 U.S. 307, 314 - 15 (1985); Ulster County Court v. Allen, 442 U.S.140, 157 - 63 (1979). The nature of a presumption is determined by analyzing the "words actually spoken to the jury," because "whether a defendant has been accorded his constitutional rights depends upon the way in which a reasonable juror could have interpreted the instructions." Sandstrom, 442 U.S. at 514. The Supreme Court of Virginia in this case determined that the jury instruction at issue, which told jurors that they "may infer that every person intends the natural and probable consequences of his acts," stated merely a permissive inference rather than a conclusive or burden-shifting presumption, and thus was not improper. Thomas, 688 S.E.2d at 239. That holding was squarely in keeping with applicable federal law on materially indistinguishable facts. See, e.g., United States v. Love, 767 F.2d 1052 (4th Cir. 1985) (finding that a jury instruction that "its reasonable to draw the inference and find that a person ordinarily intends the natural and probable consequences of acts knowingly done or knowingly omitted" merely instructed the jury what a reasonable inference would be, and did not require the jurors to draw any inference); United States v. Arthur, 544 F.2d 730, 737 (4th Cir. 1976) ("An instruction that it is reasonable to infer that a person ordinarily intends the natural and probable consequences of his voluntary acts has generally been held proper."); see also, Dupuy v. Cain, 201 F.3d 582, 588 (5th Cir. 2000) (finding that an instruction that "[a]s a general rule it is reasonable to infer that a person ordinarily intends all the natural and probable consequences of acts knowingly done or knowingly omitted by him" did not prejudice the defendant because it only "provided for an allowable inference; it did not create the prohibited presumption.").

The District Court for the Western District of Virginia arrived at this conclusion with

respect to the same Virginia jury instruction under discussion here in <u>Gutersloh v. Watson</u>, 2010

WL 3664057 at *4 (W.D.Va. Sept. 17, 2010), <u>appeal dismissed</u>, 406 Fed. App'x 718 (4th Cir.

2010).   That Court reasoned:

> In any event, it is clear that his argument fails on the merits. Gutersloh argues that Jury Instruction 6B deprived him of his due process right against conviction except upon proof beyond a reasonable doubt by inappropriately relieving the State of its burden of proof with regard to Gudersloh's intent. Relying on *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), Gutersloh claims that Instruction 6B's statement that the jury 'may infer' that Gutersloh intended the natural and probable consequences of his actions created a mandatory presumption that instructed the jury that they *must* infer that he intended the natural and probably consequences of his conduct. As the respondent correctly observes, however, the Supreme Court has made it abundantly clear that, while mandatory presumptions may violate a defendant's due process rights,
>
>> [a] permissive inference does not relieve the State of its burden of persuasion because it still requires the States to convince the jury that the suggested conclusion should be inferred based on the predicate facts proved. A permissive inference violates the Due Process Clause only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury.
>
> *Francis v. Franklin*, 471 U.S. 307, 314-15, 105 S.Ct. 1965, 85 L.Ed2d 344 (1985). There is no serious doubt, despite Gudersloh's contorted construction of the word 'any,' that the language of Instruction 6B constitutes only a permissive inference that did not impermissibly shift the burden of persuasion to the defendant. *See Peterson v. Murray*, 904 F.2d 882, 888 (4th Cir. 1990) (holding that a jury instruction did not impermissibly shift the burden of production when it told the jury, 'You may infer malice from the deliberate use of a deadly weapon unless, from all the evidence, you have a reasonable doubt as to whether malice existed.'); *Davis v. Allsbrooks*, 778 F.2d 168, 172-73 (4th Cir. 1985). Even on the merits, therefore, Gutersloh's claim must fail.

For the reasons discussed in the foregoing opinion, this Court agrees with the conclusion

of the Western District that the jury instruction at issue advised petitioner's jurors with no more than a permissive inference that they could, but were not required to, infer that she intended the natural and probable consequences of her acts. Such an instruction did not shift the burden of persuasion to petitioner. Therefore, the Constitution was not offended by the instruction, and petitioner's argument to the contrary must fail.

In the Memorandum of Law supporting her petition, Thomas argues on the basis of Boyde v. California, 494 U.S. 370 (1990) that there is a "reasonable likelihood" that the jurors in her case construed or applied the relevant instruction in an unconstitutional manner and that it therefore was ambiguous. Specifically, petitioner argues that (1) use of the language "every person" instead of "a person" creates an "intolerable possibility" that the jurors might have interpreted the presumption as conclusive rather than permissive; (2) there was a reasonable likelihood that the jurors viewed the presumption as optional, and allowed then to assume guilt from an isolated fact; and (3) it was likely that the jurors interpreted the instruction as shifting the burden of proof to her. The Court is not persuaded by any of these positions. Petitioner cites no authority for the importance she ascribes to the use of the word "every" in the instruction, and the Court finds, as did the Western District in Gutersloh, that because the instruction plainly tells jurors only that they "may"infer that a person intends the consequences of his actions "[t]here is no serious doubt ...that the language of [the instruction] constitutes only a permissive inference...." 2010 WL 3664057 at *4; accord, Winegart v. State, 665 N.E.2d 893 (Ind. 1996) (finding that an instruction that permitted the inference that "every person intends the natural and probable consequences of his voluntary acts" described permissive inferences because "may" is a "permissive term").

Petitioner's argument that the instruction was unconstitutionally ambiguous fares no better. An ambiguous instruction requires reversal only where "there is a reasonable likelihood that the jury has applied [it] in a way" that violated the defendant's constitutional rights. Estelle v. McGuire, 502 U.S. 62, 72 - 73 (1991), quoting Boyde, supra. As the Supreme Court has observed,

> Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.

Boyde, 494 U.S. at 380 - 81. Where, as is true with the instruction at issue, a permissive presumption leaves the trier of fact free to credit or reject the inference and does not shift the burden of proof, it affects the application of the "beyond a reasonable doubt" standard of guilt only if, under the facts of the case, "there is no rational way the trier could make the connection permitted by the inference." Ulster County, 442 U.S. at 157. Under the facts of this case, as extensively quoted above, there was ample evidence which would have allowed the jury to infer that petitioner intended the consequences of her actions, up to and including the death of her father. Accordingly, even if the instruction under discussion were deemed ambiguous, it could not have been applied in a manner that violated the Constitution. Cf. Estelle, 502 U.S. at 72.

For all of the reasons already discussed, the Court does not credit petitioner's assertion that a "reasonable likelihood" existed that instruction shifted the burden of persuasion to her. Without "parsing [the] instruction[] for subtle shades of meaning," an exercise in which it must be assumed petitioner's jurors did not participate, Boyde, 494 U.S. at 380, "there is no serious

14

doubt ... that [its] language ... constitutes only a permissive inference that did not impermissibly shift the burden of persuasion to the defendant." Gutersloh, 2010 WL 3664057 at *4.  Thus, the Court finds no merit in any of the arguments petitioner puts forward for finding the instruction at issue constitutionally infirm.

Lastly, as respondent argues, even if the jury charge at issue were improper, a Sandstrom error in a jury instruction is subject to the harmless error rule.  Carella v. California, 491 U.S. 263, 266 (1989);  Rose v. Clark, 478 U.S. 570 (1986).  When a federal court reviews a state court judgment in a habeas proceeding, it

> ... does not ask whether the evidence of guilt was sufficient, whether the jury would have reached the same conclusion if the evidence of guilt was sufficient, whether the jury would have reached the same conclusion if the error had not occurred, or whether the jury reached the correct result based on the evidence presented.  Rather, the court reviews the record de novo to determine whether the error 'substantially sway[ed] or substantially influence[d] the response' of the jury to the question put to it - *i.e*,. in the guilt context, whether the defendant is guilty or not guilty. The distinction between the type of harmless-error review necessary on direct review compared to that applicable in habeas review is especially well defined in the context of an improper jury charge. The Supreme Court has instructed that is assessing whether an improper jury instruction had a substantial and injurious effect on the verdict, a court need not conclude that 'the facts found by the jury establish[] that the jury *necessarily* found' the element on which the improper instruction was given as would be required on direct review.

Gilbert v. Moore, 134 F.3d 642, 648 (4th Cir. 1998) (citations omitted, emphasis original).

Based on the record in this case, Thomas' argument in her Memorandum in Opposition to Respondent's Motion to Dismiss that the instruction at issue substantially swayed the jury in its determination that she knew in advance that her father would be murdered is virtually specious. Under Virginia law, a defendant is guilty as a principal in the second degree if he is guilty of

some overt act done knowingly in furtherance of the commission of the crime, or if he shared in the criminal intent of the principal who commits the crime. McMorris v. Commonwealth, 276 Va. 500, 505 - 06, 666 S.E.2d 348, 351 (2008). Lack of intent is usually a defense to a conviction as a principal in the second degree, unless it is shown that there was a concert of action among the perpetrators and the resulting crime, whether or not it was originally contemplated, was a natural and probable consequence of the intended wrongful act. Id.

Petitioner in this case maintained that she lacked the intent to join in her father's killing because she did not know Avent had brought a weapon when they entered her father's house without permission, because she was unaware of the contents of the duffle bag they picked up at Avent's mother's home. Petitioner testified that it was not until after the argument ensued with her father regarding the welfare checks and Avent pushed her aside and pulled a sawed-off shotgun from his pants that she realized he was armed. However, as the Supreme Court of Virginia found, the jury "was entitled to disbelieve" this assertion by petitioner that she did not know of the presence of the weapon when she entered her father's home, as it was "implausible" both that she would not have seen Avent retrieve it from the duffle bag or conceal it is his pants leg. Thomas, 688 S.E.2d at 234.[2]  When Avent ordered Thomas' father to go upstairs to get the

---

[2]Petitioner notes that respondent's memorandum sets out "a detailed and one-sided account of the evidence against the accused drawn from the opinion of the Supreme Court of Virginia, but that summary was merely an undisputed listing of the prosecution's evidence and testimony considered in the best possible light to the State...." Pet. Mem. in Opp. at 6. If Petitioner intends to suggest that either the Court or the respondent was not entitled to take precisely such a view of the evidence, she is mistaken. On direct appellate review of a criminal conviction in Virginia, evidence is to be viewed in the light most favorable to the Commonwealth, and all fairly-deducible reasonable inferences are to be indulged in its favor. Higginbotham v. Commonwealth, 216 Va. 349, 352, 218 S.E.2d 534, 537 (1975). And on federal habeas corpus review of a state conviction, the state court's factual findings are presumed to be sound unless petitioner rebuts that presumption by clear and convincing evidence. Lenz v. Washington, 444 F.3d 295 (4th Cir.), cert. denied, 548 U.S. 928

checks, Thomas followed, and the jury thus was "entitled to conclude" that both intended to force the father to surrender the checks by threat of violence or actual violence. Id. Perhaps most telling, petitioner was present when her father was murdered, and she did not intervene. Indeed, her father "did not die from the gunshot would; rather, he died from a particularly vicious beating with the sawed-off shotgun. The injuries were horrific and the beating so savage that the weapon broke apart. Thomas did nothing to intervene." Id. Afterwards, she assisted in disposing of the body, cleaning the crime scene, and disposing of evidence. Id. In addition to these actions, petitioner's shared intent to kill was demonstrated by several statements she had made on previous occasions that she wished her father were dead, that she would kill him herself or have someone kill him, and by her admitted prior attempt to shoot him herself. Id. Despite knowing that her father had forbidden her to come into his home and would resist her efforts to obtain the welfare checks, petitioner joined Avent in entering her father's house through the back door without permission. Based on these circumstances, the Supreme Court of Virginia noted, "It is reasonable to conclude that [petitioner] knew there would be a confrontation and that violence may result. Because of that inherent implausibility, the jury was entitled to disbelieve her denial that she knew Avent had a sawed off shotgun when they entered the home." Id. at 235 - 36.

Because of the strength of the foregoing evidence, petitioner's argument that the jury instruction at issue "exerted a powerful influence on the outcome of this case" by "instruct[ing]" the jurors to conclude that her "mere decision to go to the home of her racist father with a black boyfriend created an incendiary situation" which, standing alone, was enough to convict

---

(2006). Petitioner in this case has made no such showing, and in fact expressly did not challenge the sufficiency of the evidence to sustain her conviction in this proceeding. Pet. Mem of Law at 4, n.2.

petitioner of the ensuing murder is simply not credible.  But even if it were, petitioner still would

not be entitled to relief:

> Even if there were a question about Thomas' shared intent to kill her
> father, a lack of shared intent is not a defense to aiding and abetting
> liability where concert of action is proved.  Here there was sufficient
> evidence of concert of action.  Avent and Thomas arrived at her
> father's home knowing that they were forbidden to be there.  They
> gained entrance through the back door.  They were intent upon
> forcing her father to surrender the welfare checks.  When he refused,
> they pursued him up the stairs where he was shot and brutally beaten.
> As in *Carter [v. Commonwealth*, 232 Va. 122, 126, 348 S.E.2d 265,
> 267-68 (1986), the violence, in this case the shooting and beating,
> 'were done as an incident of [a] common purpose.'  Thomas and
> Avent shared the intent to 'use ... such force, violence, or intimidation
> as would be expedient for the accomplishment of their purpose.  *Id.*
> at 126, 348 S.E. 2d at 267.  As in *Carter*, '[a]n incidental probable
> consequence of such a shared intent was the use of a weapon,
> including a firearm if one should be at hand.  In such circumstances,
> the law is well settled in Virginia that each co-actor is responsible for
> the acts of the others, and may not interpose ... personal lack of intent
> as a defense.'  *Id.*

Thomas, 688 S.E.2d at 236.[3]

Here, then, where the evidence that petitioner acted in concert with her boyfriend to enter

her father's home without permission to force him to surrender the welfare checks, a lack of

shared intent was not a defense to her guilt of murder as a principal in the second degree.  Thus,

the jury instruction concerning her intent, even if erroneous, was harmless, Carella, 491 U.S. at

266, and warrants no federal relief.

---

[3]Significantly, the Court in Carter expressly noted that where one acts in concert with others
to commit an unlawful act, he is responsible for the acts of the others, including those actions taken
incident to the common purpose, and that in such a situation, "[t]he Commonwealth's failure to
prove that [the defendant] had advance knowledge of his co-actor's possession of a firearm is
immaterial."  Carter, 348 S.E. 2d at 267 - 68.

## IV.  Conclusion

For the foregoing reasons, respondent's Motion to Dismiss will be granted, and this petition will be dismissed with prejudice.  An appropriate Order shall issue.

Entered this _____ day of _____ 2012.

_____
/s/
Gerald Bruce Lee
United States District Judge

Alexandria, Virginia

19